UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**STEVEN J. SCHMIEDEBUSCH**,                    Case No. 3:11 CV 1417

        Plaintiff,                    Magistrate Judge James R. Knepp II

    v.                    MEMORANDUM OPINION AND
                                  ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

        Defendant.

### INTRODUCTION

Plaintiff Steven J. Schmiedebusch, appeals the administrative decision denying his application for disability insurance benefits (DIB). The district court has jurisdiction over this case under 42 U.S.C. § 405(g). The parties consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 14). For the reasons below, the Court affirms the Commissioner's decision denying benefits.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB on January 5, 2007, alleging a disability onset date of October 28, 2006. (Tr. 128 –30). Plaintiff asserts he is disabled due to Reflex Sympathetic Dystrophy (RSD), bulging discs in his cervical spine located at C5–C6 and  C6–C7, bilateral knee osteoarthritis, bilateral carpel tunnel, depression and anxiety. (Tr. 128–30, 148, 163, 209, 383–34, 421). His claim was denied initially and on reconsideration. (Tr. 11, 68–69). Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (Tr. 80). Plaintiff appeared with counsel and testified at a hearing before the ALJ on March 9, 2009, with a subsequent hearing November 5,

2009 in Lima, Ohio. (Tr. 22, 36).[1] On May 25, 2010, the ALJ issued a written decision denying Plaintiff's claim. (Tr. 8). The ALJ found Plaintiff was not entitled to benefits because he could perform limited sedentary work. (Tr. 17) The ALJ made this determination after reviewing the entire record in conjunction with an ALJ's residual functional capacity finding from a prior DIB claim filed by the Plaintiff. (Tr. 11–12, 17). Plaintiff filed the prior application for DIB on November 12, 2003 alleging a disability onset date of September 23, 2002. The ALJ denied the prior application for DIB on October 27, 2006. (Tr. 55). The disabilities alleged and reviewed in the prior claim were: RSD; left wrist cartilage tear; cervical disc protrusions at C5–6 and C6–7; cervical stenosis; chronic neck and shoulder pain; depression; and anxiety. (Tr. 60–61). Plaintiff did not seek judicial review of the prior claim denied on October 27, 2006. Plaintiff instead filed a second DIB claim presently at issue before the Court.

## FACTUAL BACKGROUND

<u>Physical Medical History</u>

Plaintiff's extensive medical history began in 1994 when he injured his left wrist at work. (Tr. 60, 428). In June 1995, Plaintiff had surgery to repair a tear in the triangular cartilage of his left wrist. (Tr. 60). As a result of surgery, Plaintiff developed RSD in his left arm. (Tr. 428). To reduce chronic pain associated with RSD, Plaintiff was injected with multiple stellate blocks. (Tr. 60, 428). Plaintiff continued to have pain but returned to work as a tow motor operator, semi-truck driver and laborer, and worked without medical incident for seven years. (Tr. 60).

On July 25, 2002, Plaintiff sustained a second work–related injury while boxing and

---

1. The ALJ held the second hearing to allow additional time for the submission of Worker's Compensation medical records and reports. (T. 11).

loading 27–inch television tubes. (Tr. 60, 428, 338, 635). Plaintiff stated he heard something snap in his neck, resulting in posterior neck and left shoulder pain. (Tr. 234, 284, 338, 428, 635). A cervical spine MRI taken September 20, 2002 revealed Plaintiff suffered from mild to moderate central stenosis at C6–7 from a central disc herniation, mild central stenosis at C5–6 from a broad base disc bulge, and mild degenerative disc disease. (Tr. 288). Dr. Black, Plaintiff's chiropractor, sent him to Dr. Routsong for neurological surgery consultation and evaluation. (Tr. 284). On October 2, 2002, Dr. Routsong reviewed the MRI and found no signs of cervical radiculpathy or myelopathy. (Tr. 285). Dr. Routsong opined there was mild disc bulging at C5–6 and C6–7, but there was no sign of disc herniation, nerve or spinal cord compression. (Tr. 234). Dr. Routsong recommended chiropractic care and exercise as opposed to surgical intervention. (Tr. 234).

On January 21, 2003, an MRI of Plaintiff's left arm and shoulder was taken due to persistent pain. (Tr. 286). The MRI showed no injury and revealed the Plaintiff's left shoulder was "normal". (Tr. 287).  On October 26, 2004, Dr. Wangler injected additional stellate ganglion blocks to decrease the pain in Plaintiff's left arm. (Tr. 624).

On February 3, 2005, Plaintiff presented to Dr. Brems in the Department of Orthopedics at the Cleveland Clinic because he continued to suffer from consistent benign pain in his left arm and neck. (Tr. 291). Dr. Brems reviewed multiple MRIs of Plaintiff's left shoulder and neck and opined his shoulder and neck were "normal with respect to shoulder architecture and shoulder mechanics." (Tr. 291). Dr. Brems noted Plaintiff's "range of motion of the shoulder [was] well maintained" with "no shoulder instability signs." (Tr. 291–92). Dr. Brems concluded Plaintiff

3

suffered from "[c]hronic benign pain with complex regional pain syndrome" and recommended treatment with a doctor specializing in complex pain issues. (Tr. 292).

In April 2006, Dr. Stanton–Hicks implanted a permanent spinal cord stimulator in Plaintiff's neck to relieve persistent pain. (Tr. 428, 449). Plaintiff later reported to Dr. Kuhlman that the stimulator "definitely did help but it did not completely relieve his symptoms." (Tr. 428).

In December 2006, Plaintiff began experiencing pain in his knees without aggravation of a known injury. (Tr. 238, 306). X-rays of Plaintiff's knees revealed "nice subchondral bone on both medial and lateral compartments of both knees." (Tr. 306). Dr. Schniegenberg opined Plaintiff suffered from osteoarthritis and recommended anti-inflammatories with the possibility of Synvisc injections due to his predisposition of RSD. (Tr. 306).

In January 2007, Plaintiff received a series of Synvisc injections. (Tr. 446-48). On February 12, 2007, Plaintiff returned to Dr. Schniegenberg and reported he still had some pain. (Tr. 444). Dr. Schniegenberg noted Plaintiff's "[n]eurocirc checks [were] good" and "[r]ange of motion [was] good" but nonetheless injected Plaintiff's knees with Depro–Medrol. (Tr. 444).

In October 2007, Plaintiff returned to Dr. Schniegenberg requesting another round of Synvisc injections due to bilateral knee pain. (Tr. 442). Dr. Schniegenberg reviewed x-rays of Plaintiff's knees and noted Plaintiff's joint spaces "look[ed] perfect" with "nice subchondral bone bilaterally, medial and lateral [in] both legs" and no evidence of spurring. (Tr. 442). Dr. Schniegenberg was apprehensive to inject Plaintiff with Synvisc again but stated that he would reconsider in a month if anti-inflammatories did not help. (Tr. 442). Dr. Schiegenberg also noted Plaintiff's RSD issues and recommended involvement in a pain clinic, RSD society, or group meetings to find a physician who specializes in RSD. (Tr. 442).

4

In January 2008, Plaintiff again returned for injections. (Tr. 441). Dr. Schniegenberg approved the injections, although he noted Plaintiff's "range of motion and strength are the same as before." (Tr. 441).

In August 2008, Plaintiff returned again for Synvisc injections. (Tr. 436). Dr. Schniegenberg approved another round of knee injections while noting the x-ray revealed Plaintiff "[did] not have significant narrowing or changes". (Tr. 436).

In 2008, Plaintiff presented to Dr. Gurley, an orthopedic surgeon, for chronic neck and back pain.[2] Spinal x-rays taken March 6, 2008 and December 28, 2007 were compared and revealed Plaintiff suffered from severe central spinal stenosis with moderate ventral cord impingement at the C5–6 level due to a broad based disc protrusion or disc bulge and associated end plate osteophyte formation and mild central spinal stenosis at C6–7. (Tr. 421). Dr. Gurley recommended spinal decompression. (Tr. 451).

On March 28, 2008, Plaintiff presented to Dr. Kuhlman for a second opinion regarding possible spinal decompression. (Tr. 428).  Dr. Kuhlman did not detect myelopathy and opined it was up to the Plaintiff and his physicians to decide whether to pursue surgery. (Tr. 428).

On August 6, 2008, Plaintiff presented to Dr. Bell at the Cleveland Clinic Spinal Institute for a third opinion regarding spinal decompression. (Tr. 460). Dr. Bell noted Plaintiff had seen multiple physicians, including at least two neurosurgeons, all of whom recommended against surgical intervention. (Tr. 461). Dr. Bell opined there was no clear indication for surgical

---

2. The record is unclear as to exactly when Plaintiff began seeing Dr. Gurley. However, sufficient evidence in the record indicates he began seeing Plaintiff in early 2008. This evidence includes statements made to Dr. Derr–Lewis (Tr. 574), Dr. Valko (Tr. 562), and Dr. Black (Tr. 695) that he was scheduled for surgery December 2, 2008. In addition, Dr. Bell indicates his opinion was at the request of Dr. Gurley. (Tr. 460).

intervention, while acknowledging Plaintiff's stenosis at C5–C6 level. (Tr. 461). Dr. Bell opined there might be psychological factors affecting Plaintiff's pain and he would not be interested in offering him surgery. (Tr. 636).

On August 12, 2008, Dr. Nielson, one of Plaintiff's treating physicians, opined that meeting with Dr. Bell "was a waste of time." (Tr. 601). Dr. Nielson went on to state Plaintiff had seen an "unknown surgeon in Lima" who stated Plaintiff was "absolutely needing surgery." (Tr. 601). Dr. Nielson noted Dr. Stanton–Hicks said to have the surgery as well. (Tr. 601). However, Dr. Nielson stated he received "no reports" from any doctor recommending surgery. (Tr. 601). Nonetheless, based on Dr. Gurley's directive, Plaintiff elected to undergo spinal decompression. (Tr. 453).

On December 2, 2008, Plaintiff underwent cervical discetomy and decompression at C5–C6 and C6–C7; anterior cervical plate fixation at C5–C6 and C6–C7; and a structural tricortical crest graft. (Tr. 453).

On April 22, 2009, Plaintiff's post–operative follow–up with Dr. Gurley revealed the "spinal instrumentation remain[ed] in good position and there [was] no evidence of loosening, migration, or implant failure." (Tr. 584). Plaintiff told Dr. Gurley "there [was] clearly improvement in his pain and function and he is optimistic regarding his recovery." (Tr. 585). On August 19, 2009, Plaintiff reported to Dr. Gurley that "[f]rom a pain and functional standpoint he fe[lt] stable although he continue[d] to experience persistent peristhesias in his left upper and lower extremities." (Tr. 584). The x-rays revealed the "spinal instrumentation remain[ed] in good position and there [was] not evidence of loosening, migration or implant failure." (Tr. 584). On

September 29, 2009, Plaintiff reported to Dr. Gurley he was "improved and stabilized from a pain and functional standpoint." (Tr. 588).

Plaintiff also had post-operative meetings with his treating physician Dr. Nielson. On January 13, 2009, Dr. Nielson reported that the "neck is fixed" although there was a minor flare of RSD. (Tr. 600). He noted Plaintiff's arm pain and parathesias were slow to recover and recommended acupuncture. (Tr. 600). Dr. Nielson continued Plaintiff's ongoing pain medications of Methadone, Zoloft, Toprol, Allegra, Meloxicam, Lotrel, C-testosterone packs, and Arimidex. (Tr. 600). On April 21, 2009, Dr. Nielson reported Plaintiff had significant improvement in his left hand movement, continued Plaintiff's pain medication prescriptions, and requested Plaintiff continue acupuncture. (Tr. 599). On June 29, 2009, Dr. Nielson reported Plaintiff's RSD remained the same, with the paresthesias slowly healing. (Tr. 598). On October 6, 2009, Dr. Nielson noted that the neck was re-imaged and showed good fusion, and but he thought a "nerve [had been] permanently damaged by the delay in surgery." (Tr. 594).

Plaintiff participated in approximately 30 sessions of outpatient physical therapy from February 2, 2009 through April 13, 2009 (Tr. 483- 537), and from October 23, 2009 through November 3, 2009 (Tr. 613-616). Plaintiff progressed in physical therapy treatment, his pain symptoms decreased with each session, and it was noted at each session Plaintiff was "progressing towards goals." (Tr. 613–616). At each visit, Plaintiff reported he complied with the home exercise program twice a day. (Tr. 613–616).

 Between March 12, 2009 through June 30, 2009, Plaintiff also received acupuncture treatments for pain management. (Tr. 566–68). Plaintiff reported acupuncture alleviated "a little"

of his pain. (Tr. 567). It was noted Plaintiff made "little progress" but acupuncture improved his condition some and he should continue with acupuncture sessions. (Tr. 567).

<u>Treating Physicians and Chiropractor</u>

Plaintiff's treating physicians were Dr. Biery (primary care) and Dr. Nielson (prolotherapist), and Dr. Black was Plaintiff's chiropractor.[3]

*Dr. Biery*

Between December 13, 2006 and September 2, 2009, Plaintiff reported to Dr. Biery ten times. (Tr. 246–48, 590–93). At these visits, Plaintiff generally received methadone refills and reported no complaints. (Tr. 246–48, 590–93). During the visits, Plaintiff consistently reported methadone helped with his pain. (Tr. 246-48, 590-93). Dr. Biery noted Plaintiff was on the following medications: Zoloft, Neurontin, Toprol, Allegra, Wellbutrin, Testosterone Cream, Mobic, Lotrel, Flexerol, and Methadone. (Tr. 246-48, 590-93).

*Dr. Nielson*

In December 2007, Plaintiff presented to Dr. Nielson for prolotherapy with a posterior approach to the neurostimulator". (Tr. 604). On December 17, 2007, Dr. Nielson opined the "cervical disc was and always has been the cause of the reflex sympathetic dystrophy and needs fixed." (Tr. 605). On April 18, 2008, Dr. Neilson recommended surgery based on Plaintiff's appointment with Dr. Gurley. (Tr. 603). On May 29, 2008, Dr. Neilson stated "[g]o ahead and do the surgery and forget the politics." (Tr. 602). On August 12, 2008 Dr. Nielson recommended surgery again. (Tr. 601).

---

3. A chiropractor is not considered a treating source under 20 C.F.R. § 404.1527(d)(2). *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997); *see also* 20 C.F.R. § 404.1513.

On January 13, 2009, Plaintiff met with Dr. Nielson post-operation. (Tr. 600). Dr. Nielson reported Plaintiff's "neck was fixed" but he thought Plaintiff would be slow to recover due to delayed care. (Tr. 600). On April 21, 2009, Dr. Nielson reported "very exciting news" that Plaintiff had total resolution of his left hand and stated Plaintiff should continue with acupuncture. (Tr. 599). On June 29, 2009, Dr. Nielson noted Plaintiff's healing was slow and recovery would take a long time. (Tr. 598). On August 29, 2009, Dr. Nielson noted Plaintiff's RSD was in slow healing mode and prescribed alpha lipoic acid to heal Plaintiff's nerves. (Tr. 596). On October 26, 2009, Dr. Nielson noted Plaintiff's re-imaged neck post-surgery showed "good fusion" and  recommended another round of acupuncture and physical therapy for pain. (Tr. 594).

Between April 13, 2009 and October 22, 2009, Dr. Nielson reported to the Bureau of Worker's Compensation (BWC) Plaintiff was not capable of working due to cervical neck pain. (Tr. 679-82).

*Dr. Black*

Plaintiff began seeing Dr. Black for chiropractic services in 2002. (Tr. 241). From September 26, 2002 to January 26, 2008, Dr. Black completed BWC forms stating Plaintiff was not capable of returning to his former position or performing light work in an alternate position. (Tr. 695–721). On September 26, 2002, Dr. Black informed BWC that Plaintiff suffered from disc herniation requiring surgical intervention and he could not return to his former position or any other employment including light work. (Tr. 721). October 14, 2002, Dr. Black acknowledged Dr. Routsong's refusal of surgical intervention but reported Plaintiff could not perform light work. (Tr. 720). January 23, 2003, Dr. Black reported Plaintiff could not return to

9

his former position or perform light work due to left upper back/arm pain. (Tr. 719). February 25, 2003, Dr. Black reported Plaintiff could not perform light work. (Tr. 718). Dr. Black continued to report to BWC Plaintiff was not capable of any type of work due to uncontrollable pain through January 26, 2008. (Tr. 695- 721).

Independent Medical Examinations

BWC required independent medical evaluations of the Plaintiff to evaluate the extent of his medical conditions for workers compensation. Each physician physically examined Plaintiff and reviewed his past medical history, including MRIs, x-rays and physician reports. The independent evaluation reports were included in the record and reviewed by the ALJ. (Tr. 14–16).

*Dr. Girgis*

On October 2, 2006, Plaintiff presented to Dr. Girgis for an independent medical evaluation. (Tr. 665). Plaintiff complained of "neck pains radiating to his left upper extremity" and stated the pain increases with "lifting and working or any activity." (Tr. 666). Upon physical examination, Dr. Girgis noted Plaintiff was "alert and oriented and in no acute distress." (Tr. 666). Plaintiff had "decreased range of motion of the cervical spine in flexion, extension, and lateral rotation." (Tr. 666). However, Plaintiff's motor exam revealed he was "5/5 [in] bilateral upper and lower extremities except for weak hand grip . . . on the left side." (Tr. 666). Dr. Girgis opined Plaintiff could not return to his former position of employment, but he stated Plaintiff was ripe for vocational rehabilitation with the following restrictions: "no heavy lifting more than 20 pounds, no pushing or pulling with his left upper extremity and no overhead activity." (Tr. 666).

10

*Dr. Kohrman*

On March 6, 2007, Plaintiff presented to Dr. Kohrman for an independent medical evaluation. (Tr. 338). Plaintiff reported to Dr. Kohrman he suffered from pain in "the left side of [his] body, head/neck, shoulder and arm and left foot." (Tr. 338). Plaintiff stated the pain is "throbbing, shooting, stabbing, sharp, hot and burning, splitting, exhausting, sickening, fearful, and punishing." (Tr. 338). Upon physical examination, Dr. Kohrman noted Plaintiff was a "well developed, well nourished male, awake, alert, and oriented x3, in no acute distress." (Tr. 339). Plaintiff had "stiffening of the head, crepitation of the left shoulder and tightness of the skin and arm, along with swelling and tenderness." (Tr. 339). Plaintiff's reflexes were "2 over 4 at the biceps, triceps and brachioradialis bilaterally." (Tr. 339). Dr. Kohrman opined Plaintiff could not return to his former position and he "cannot do much of anything and everything is very inconsistent." (Tr. 339). Dr. Kohrman stated that current treatment thus far had been appropriate but Plaintiff should consider "cryotherapy or prolotherapy". (Tr. 339). Dr. Kohrman opined that Plaintiff had not reached maximum medical improvement from a BWC standpoint. (Tr. 339).

*Dr. Thaxton*

On September 14, 2007, Plaintiff presented to Dr. Thaxton for an independent medical evaluation. (Tr. 645). Plaintiff reported to Dr. Thaxton he experienced a "constant achy feeling with occasional intermittent burning type pains into the shoulder and arms." (Tr. 647). Upon physical examination, Dr. Thaxton noted Plaintiff has "normal strength in the right upper extremity" but "decreased grip strength as well as triceps strength in the left upper extremity." (Tr. 647). Dr. Thaxton opined Plaintiff had not reached maximum medical improvement from a BWC standpoint and he was not ripe for vocational rehabilitation. (Tr. 647). Dr. Thaxton noted

11

Plaintiff's functional limitations include the occasional ability to "lift and carry up to 10 pounds, nothing greater than 11 pounds." (Tr. 648). Dr. Thaxton noted Plaintiff had the "occasional ability to bend, twist, and turn" and was "frequently able to stand, walk, and sit". (Tr. 648). However, Plaintiff was not able to "reach below knee, push, pull, squat, kneel or lift above the shoulders." (Tr. 648). Dr. Thaxton noted her functional limitation assessment was temporary. (Tr. 648).

*Dr. Rusin*

On July 13, 2008, Plaintiff presented to Dr. Rusin for an independent medical evaluation. (Tr. 657). Upon physical examination, Dr. Rusin noted Plaintiff walks slow but has "no profound gait dysfunction." (Tr. 658). Plaintiff was "alert and oriented, coherent and cooperative." (Tr. 658). Plaintiff has "limited motion in his left shoulder" and he is able to "walk forward on his toes and backwards on his heels but with difficulty." (Tr. 658). Dr. Rusin recommended decompression of Plaintiff's cervical spine due to ongoing pain symptoms. (Tr. 658). Dr. Rusin opined that Plaintiff had not reached maximum medical improvement from a BWC standpoint but he is capable of "light [sedentary] work."[4]

*Dr. Muha*

On October 31, 2008, Plaintiff met with Dr. Muha for an independent medical evaluation. (Tr. 449). Plaintiff reported he was undergoing cervical surgery for spinal fusion and stenosis. (Tr. 449). Plaintiff reported complaints of pain in his right and left hands. (Tr. 449). Upon physical examination, Mr. Muha noted Plaintiff was "pleasant" and "neatly groomed and dressed." (Tr. 449). Plaintiff had "good gross grip but pain with pinch" in his left hand; "no

---

4. Dr. Rusin noted Plaintiff could perform light "sedimentary" work. (Tr. 659). Based on Dr. Rusin's entire report, the Court concludes Dr. Rusin meant light "sedentary" work.

instability" and "good motion" in his right hand; and "full motion of his [right] wrist, [with] no carpel tenderness or instability." (Tr. 449). Dr. Muha opined to BWC Plaintiff had mild to moderate carpel tunnel syndrome. (Tr. 450).

*Dr. Kovesdi*

On October 7, 2009, Plaintiff met with Dr. Kovesdi for an independent medical evaluation. (Tr. 634). Plaintiff reported the cervical surgery helped "improve his neck complaints, although not completely." (Tr. 637). Upon physical examination, Dr. Kovesdi noted Plaintiff had "excellent upper body muscular development with a mild atrophy of the left arm compared to the right." (Tr. 637). Dr. Kovesdi opined that Plaintiff had reached maximum medical improvement in regards to his neck, left shoulder and cervical discs from a BWC standpoint. (Tr. 638). Dr. Kovesdi opined Plaintiff had not reached maxim medical improvement for his RSD from a BWC standpoint. (Tr. 638). Dr, Kovesdi noted he could not make comment on the "psychogenic pain" as it was not his area of expertise. (Tr. 638). Dr. Kovesdi opined Plaintiff could not return to his former position. (Tr. 638). Dr. Kovesdi limited Plaintiff to "sitting, sedentary activities only" with avoidance of "repetitive neck movements". (Tr. 638).

Mental Health Medical History

In 2004, due to persistent pain and medical problems, Plaintiff sought treatment for depression and anxiety. Dr. Derr–Lewis treated Plaintiff in bi–weekly psychotherapy sessions and Dr. Valko provided psychiatric treatment and medication. (Tr. 383).

*Dr. Derr–Lewis*

In November 2004, Plaintiff began psychotherapy treatment with Dr. Derr Lewis. (Tr. 383). Dr. Derr–Lewis's assessments include a letter to Plaintiff's counsel dated May 8, 2007 (Tr.

383–84), a mental status questionnaire from BWC on March 14, 2007 (Tr. 251–57), and internal session notes from August 2, 2006 through October 11, 2007. (Tr. 378–96).

Dr. Derr–Lewis's internal notes from 2004 through 2007 reflect Plaintiff's concerns he will not be covered under social security disability, he will never work again, and ongoing frustration with pain management. (Tr. 378–96). On April 25, 2007, Dr. Derr–Lewis opined Plaintiff was "stable enough now that visits can be reduced to monthly." (Tr. 385). On October 11, 2007, Plaintiff stated he was "frustrated by problems applying for SSD" and "he [couldn't] think of anything he could do workwise other than a political appointee." (Tr. 378).

On March 14, 2007, Dr. Derr–Lewis filled out a BWC Questionnaire regarding Plaintiff's mental health. (Tr. 253). Dr. Derr–Lewis opined Plaintiff's appearance was "very good," his flow of conversation and speech were "good," but he had "mild memory impairment" and his "estimated intelligence [was] fair/average." (Tr. 253). In addition, his "insight [was] fair" and he [was] "focused on medical solutions to his problems." (Tr. 253). Dr. Derr–Lewis stated his ability to maintain attention and understand was intact but he had "moderate impairment in ability to remember and follow instructions." (Tr. 254).

However, two months later on May 8, 2007, Dr. Derr–Lewis opined in a letter to Plaintiff's counsel that Plaintiff "[was] permanently and totally disabled as a result of his psychological condition." (Tr. 383). Dr. Derr–Lewis declared Plaintiff had reached a treatment plateau and would not improve with continued treatment. (Tr. 383). Dr. Derr-Lewis opined Plaintiff "would be unable to function in any kind of remunerative employment as a result of his psychological condition." (Tr. 383).

*Dr. Valko*

Plaintiff's treatment with Dr. Valko reveals a controlled depressed state managed with medication. (Tr. 229-31, 611). On May 10, 2006, Plaintiff reported to Dr. Valko that he "does not believe he is having as many difficulties with his depressive features" (Tr. 231); November 8, 2006, Plaintiff reported he "was in good spirits" and he is "doing well on his medications" (Tr. 229); August 2, 2005, Plaintiff stated his bouts of depression were short lived and the anti-depressants he was taking "seem[ed] to be working best for him" (Tr. 230); and January 10, 2008, Dr. Valko noted Plaintiff was "in a pleasant mood, as he smiled, generated conversations and responded to questions appropriately" and he "displayed intact thought content." (Tr. 565). On July 30, 2008, Dr. Valko noted Plaintiff was stable even in light of family issues following the death of his mother. (Tr. 563). On January 13, 2009, Plaintiff reported to Dr. Valko he was "doing well" after spinal surgery. (Tr. 561). Dr. Valko stated he informed Plaintiff of his "maximum medical improvement" from a BWC standpoint and noted Plaintiff's speech was "clear and coherent" and his "thoughts were well organized and goal directed." (Tr. 561).

Vocational Assessment

On April 4, 2007, Plaintiff met with Dr. Jubenville to conduct vocational testing required by BWC. (Tr. 326). Dr. Jubenville noted Plaintiff's "intellect, verbal skills, reasoning ability and attention span were all normal." (Tr. 326). Dr. Jubenville noted while Plaintiff expressed "anxiety during testing", "he managed to complete all the tests." (Tr. 326). Plaintiff reported his social life consisted of medical appointments and his children's school events. (Tr. 327). Plaintiff reported no hobbies and said he is "anxious whenever he is required to leave the home." (Id.). Plaintiff completed the WRAT4 test which measures spelling, reading comprehension, and math computation. (Tr. 328). The Plaintiff scored "low" in reading and spelling, "average" in math

computation, and "lower extreme" in sentence computation.[5] (Tr. 328).  Dr. Jubenville noted Plaintiff's scores on the WRAT4 "indicate he is capable of achieving at a junior high level." (Tr. 336). However, Dr. Jubenville noted when transferring Plaintiff's scores to possible work positions, the results did "not seem consistent with other tests and the observations of [Plaintiff] during the interview and testing." (Tr. 336). Dr. Jubenville further opined that given Plaintiff's reading level, the reliability of the results were "questionable." (Tr. 336).

Disability Reports & Residual Functional Capacity (RFC) Determinations

In October 2007, Plaintiff submitted a functional limitation questionnaire. (Tr. 173). Plaintiff reported he helps with his kids, takes the dog outside, and some days sweeps the carpet. (Tr. 173-75). Plaintiff stated he only sleeps about 3-4 hours a night and can only sleep comfortably in his recliner. (Tr. 174). On April 18, 2008, Plaintiff reported that during the day he helps his wife with house cleaning and "once in while" he will pick up the yard or walk the dog. (Tr. 156).

On May 24, 2007, Dr. Edmond Garner assessed Plaintiff's physical RFC. (Tr. 298-305). Dr. Gardner determined Plaintiff could occasionally lift and/or carry (including upward pulling) 20 pounds or less; frequently lift or carry (including upward pulling) 20 pounds or less; stand or walk for 6 hours in an 8 hour workday; and sit for 6 hours in an 8 hour work day. He opined Plaintiff had unlimited capability to push or pull notwithstanding lifting restrictions, but limited capability in overhead reach gross manipulation handling. (Tr. 299-301). There was no limitation

---

5. WRAT4 scores are rated (from low to high): lower extreme, low, below average, average, above average, superior, extreme. (Tr. 328).

placed on balancing, stooping, kneeling, crouching, or crawling, but Plaintiff was limited to occasional climbing. (Tr. 300).

On April 26, 2007, Dr. Joan Williams assessed Plaintiff's mental RFC. (Tr. 206-64). Dr. Williams concluded Plaintiff was not significantly limited in his ability to remember locations and work–like procedures; his ability to understand and remember short and simple instructions; his ability to sustain an ordinary routine without special supervision; his ability to make simple work related decisions; his ability to interact appropriately with general public; his ability to ask simple questions or request assistance; his ability to maintain socially appropriate behavior; his ability to be aware of normal hazards and take appropriate precautions; his ability to travel unfamiliar places or use public transportation; and his ability to set realistic goals or make plans independently of others. (Tr. 260–61). However, Plaintiff was moderately limited in his ability to understand and remember detailed instructions; his ability to carry out detailed instructions; his ability to maintain attention and concentration for extended periods; his ability to perform activities within a schedule, maintain regular attendance and be punctual with customary tolerances; his ability to work in coordination with or proximity to others without being distracted by them; his ability to complete a normal workday without interruptions from psychological based symptoms; his ability to respond appropriately to criticism from supervisors; ability to get along with coworkers without distracting them or exhibiting behavioral extremes; and his ability to respond to changes in the workplace. (Tr. 260–61).

Administrative Hearings and ALJ Findings

Plaintiff appeared with counsel and testified before the ALJ on March 9, 2010 and November 5, 2009. (Tr. 11). Plaintiff's testimony at the hearings revealed his involvement in social activities not previously reported. Plaintiff stated he recently "bought two properties"

17

involving him in litigation with the City of Toledo. (Tr. 43). Plaintiff testified he hired people to fix the first house but was in the process of tearing down the second home. (Tr. 43). In addition, Plaintiff eventually admitted he was involved in local politics as a political appointee in his county. (Tr. 52–53). At the first hearing, the ALJ requested BWC medical information from Plaintiff and continued the hearing until he had the opportunity to review it. (Tr. 53). At the second hearing, Plaintiff testified his condition had "gotten almost worse" since spinal surgery and he spends "85% of the day" in a recliner chair due to persistent pain. (Tr. 28–29). In terms of social ability, Plaintiff stated he was very confrontational and he would "absolutely" have trouble in a job setting. (Tr. 30). Plaintiff testified he can only walk "20 yards comfortably" and he drags his left behind when he walks. (Tr. 31).  Plaintiff also testified Dr. Gurley stated Plaintiff might have "a screw or something . . . loose in his back." (Tr. 31).

The ALJ denied Plaintiff's claim in a decision dated May, 25, 2010. (Tr. 11-21). At the outset, the ALJ explained he was obligated to consider the ruling in *Drummond v. Commission of Social Security*, 126 F.3d 837 (6th Cir. 1997) because the prior ALJ had previously denied Plaintiff's application for benefits. (Tr. 11-12). The ALJ explained that pursuant to *Drummond*, he must adopt the RFC  finding from the final decision of the ALJ in the prior claim, unless there is new and material evidence relating to such a finding that Plaintiff's condition has changed. (Tr. 12). The ALJ adopted the RFC set forth in the October 27, 2006 ALJ decision (Tr. 64), noting "after careful review of the entire record . . . . additional evidence received since the prior ALJ finding does not show a significant increase in symptomology and does not support a more restrictive residual functional capacity assessment." (Tr. 17).

The ALJ declared the Plaintiff had the RFC to:

18

sit, stand, and walk about six hours in an 8-hour workday, occasionally lift and carry 10 pounds with the left hand, 30 pounds with the right hand, occasionally perform fine and gross manipulation with the left hand, and squat and stoop without limitation. He is precluded from overheard reaching with the left upper extremity, climbing ladders, ropes or scaffolds, working around unprotected heights or around moving machinery, crawling, working in temperatures below 60 degrees, or performing work requiring left to right gaze (at 90 degrees) on a consistent or frequent basis. Additionally, the claimant remains capable of understanding and remembering simple work instructions, sustaining concentration and persistence for simple, routine work duties, and carrying out tasks involving static duties.

(Tr. 17).

Based on the RFC finding, the ALJ determined Plaintiff could perform a limited range of sedentary work (Tr. 21). Because Plaintiff could perform a significant number of jobs which existed in the national economy, the ALJ held Plaintiff was not disabled at any time through the date he was last insured for benefits. (Tr. 21); *see also* 20 C.F.R. 404.1520(g). The Appeals Council denied review (Tr. 1), making the ALJ's decision the final decision of the Commissioner.

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a

preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. §§ 423(a)(1)(E), 1382(a)(1). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age,

20

education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)–(f) & 416.920(b)–(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff asserts three arguments challenging the ALJ's decision:

1.  The ALJ erred in his determination of Plaintiff's residual functional capacity;

2.  The ALJ erred by not affording substantial weight to the treating physician's opinions; and

3.  The ALJ erred by failing to adequately consider Plaintiff's subjective allegations against the objective medical advice.

(Doc. 9, at 2).

For the reasons discussed below, each of Plaintiff's arguments fails.

**RFC Finding and *Drummond* Analysis**

Prior decisions of the Commissioner which were not appealed are binding on a claimant and the Commissioner. *Drummond,* 126 F.3d at 841. In *Drummond*, the Sixth Circuit held that the Commissioner is bound by its prior findings with regard to a claimant's RFC unless new evidence or changed circumstances require a different finding. *Drummond*, 126 F.3d at 842. Social Security Acquiescence Ruling 98-4(6) therefore mandates:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

AR 98-4(6), 1998 WL 283902, at *3.

It is Plaintiff's burden to show that circumstances have changed since the prior ALJ's decision "by presenting new and material evidence of deterioration." *Drogowski v. Comm'r of Soc. Sec.*, 2011 WL 4502988, at *8 (E.D. Mich. July 12, 2011) *report and recommendation adopted*, 2011 WL 4502955 (E.D. Mich. Sept. 28, 2011). Such evidence is new only if it was "not in existence or available to the claimant at the time of the [prior] administrative proceeding." *Sullivan v. Finkelstein,* 496 U.S. 617, 626 (1990). Such evidence is "material" only if there is "a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988).

The following conditions were considered and reviewed in both Plaintiff's claims for DIB: complex regional pain syndrome affecting the left hand; degenerative disc disease in the cervical spine; hypertension; chronic anxiety and depression; and degenerative disc disease in the cervical spine at C5–6. (Tr. 14, 60).

The ALJ's conclusion that the evidence did "not show a significant increase in symptomology" or "a more restrictive residual functional capacity finding" is supported by substantial evidence in the record. Further, substantial evidence in the record shows "a reasonable probability" the Commissioner would have reached the same conclusion regarding new and material evidence. *Sizemore*, 865 F.2d at 711.

*Cervical Spine Condition*

First, multiple physicians, both treating and independent, reviewed and assessed the same spinal condition throughout Plaintiff's prior claim and the claim currently before the Court. MRIs taken September 20, 2002, December 28, 2007, and March 6, 2008 reveal Plaintiff suffered from spinal stenosis with bulging discs located in the C5–6 and C6–7 region. (Tr. 288, 421).

Second, Plaintiff brought forth no evidence his spinal condition had deteriorated since his prior claim. While the Court notes Plaintiff underwent surgery, the surgery aimed to repair the same spinal condition from which Plaintiff suffered since 2002. Dr. Black, Plaintiff's chiropractor, merely reported to BWC between 2002 and 2009 that Plaintiff was not capable of working due to neck and back pain. (Tr. 695–721). In addition, between 2002 and 2009 Dr. Biery continually prescribed Plaintiff's pain medication while noting his condition remained the same. (Tr. 246–48, 590–93).

Third, in light of Plaintiff's condition, multiple physicians, in the prior and current claim, determined Plaintiff could perform activities consistent with sedentary work. On October 2, 2006 Dr. Girgis noted Plaintiff was ripe for vocational rehabilitation but restricted from lifting more than 20 pounds or lifting overhead with his left arm (Tr. 666); September 14, 2007, Dr. Thaxton noted Plaintiff had the ability to lift and carry up to 10 pounds, occasionally bend, twist, and turn, and was frequently able to stand, walk or sit (Tr. 684); July 13, 2008, Dr. Rusin stated Plaintiff could perform light sedentary work (Tr. 658); October 7, 2009, Dr. Kovesdi stated Plaintiff was limited to sedentary activities only. (Tr. 638). These opinions are consistent with the ALJ's adoption of the prior RFC. Therefore pursuant to *Drummond*, Plaintiff's argument the ALJ erred in determining Plaintiff's RFC regarding his spinal condition fails.

23

*Depression and Anxiety*

Next, Plaintiff argues his depressive symptoms, including difficulty sleeping, social isolation, feelings of hopelessness, poor frustration tolerance, and irritability do not allow him to maintain the necessary concentration and social functioning abilities necessary for sedentary work. (Doc. 9, at 10). Plaintiff's argument fails, even without application of *Drummond*, because there is substantial evidence in the record supporting the ALJ's RFC determination in consideration of Plaintiff's depression and anxiety.

First, the record shows Plaintiff's depressive symptoms are controlled with medication. From 2006 to 2009, Plaintiff reported to Dr. Valko, his treating psychiatrist, that he was not having difficulties with his depressive features and was doing well on his medications. (Tr. 229–31, 561–65). In addition, Dr. Valko continually noted Plaintiff was in a good mood, stable, displayed intact organized thought content and was goal directed. (Tr. 229–31, 561–65). While Plaintiff relies on Dr. Derr–Lewis's statement that Plaintiff is not capable of remunerative employment, it simply does not square with her report to BWC that Plaintiff has fair insight, the ability to maintain attention, a moderate ability to follow instructions, and good flow of conversational speech. (Tr. 254, 383).

Second, the record is replete with instances reflecting Plaintiff's positive social capacity. Multiple physicians note Plaintiff was well dressed, pleasant, and responded to questions well during evaluation. (Tr. 253, 449, 565, 658). In addition, Plaintiff volunteers as a political appointee, purchased two homes involving consistent contact with the City of Toledo, and attends his children's school events. (Tr. 43, 52–53).

Based on the substantial evidence supporting the ALJ's conclusion, Plaintiff's argument that he is incapable of understanding and remembering simple work instructions, sustaining concentration and persistence for simple, routine work duties, and carrying out tasks involving static duties fails.

*Bilateral Carpel Tunnel and Bilateral Knee Osteoarthritis*

Plaintiff also argues the ALJ erred in finding Plaintiff could perform a restricted range of sedentary level work due to bilateral carpel tunnel and bilateral osteoarthritis of the knees. (Doc. 9, at 10). Specifically, Plaintiff argues he is restricted in his ability to walk, stand, or perform the fine and gross motor movements required for a sedentary position. (Doc. 15, at 2). While Plaintiff's knee osteoarthritis and bilateral carpel tunnel could plausibly be considered new conditions, they are not material. There is a reasonable probability the prior ALJ would have reached the same conclusion in light of these additional conditions based on substantial evidence in the record. *Sizemore,* 865 F.2d at 711.

First, Plaintiff argues he is unable to perform the grasping and handling or fine and gross motor requirements of sedentary work due to his carpel tunnel diagnosis. (Doc. 9, at 11). However, as Defendant points out, a diagnosis is not per se evidence of a disabling condition as it provides no information about the severity of the condition or the limitations it may warrant. *Foster v. Bowen*, 853 F.2d 483, 489 (6th Cir. 1988). In addition, the record reflects Plaintiff's ability to perform occasional fine gross movements, which the ALJ accounted for in his RFC finding. (Tr. 346, 449, 599). On October 31, 2008, Dr. Muha noted Plaintiff has "good gross grip but pain with pinch" in his left hand. (Tr. 449). On April 21, 2009 Dr. Nielson, Plaintiff's treating physician, reported "very exciting news" that Plaintiff had total resolution of his left hand. (Tr. 599).

25

Moreover, Dr. Black notes Plaintiff is able to engage in occasional fine and gross motor handling. (Tr. 346). Further, the record reflects "no instability" and "good motion" in Plaintiff's right dominant hand. (Tr. 449). Moreover, the ALJ accommodated Plaintiff's condition by restricting him to only occasional fine and gross motor manipulation with his left hand, a consistent finding based on substantial evidence in the record.

Second, Plaintiff argues he is unable to walk or stand for prolonged periods on account of his bilateral knee osteoarthritis. (Doc. 9, at 9–10). As Defendant points out, sedentary work does not require prolonged standing or walking, but mostly sitting. (Doc. 12, at 15); Social Security Ruling 83-10, 1983 SSR Lexis 30 (SSR 1983). In addition, the record is clear that Plaintiff's knee symptoms were controlled with periodic Synvisc knee injections. (Tr. 432-50). Dr. Schniegenberg continuously noted Plaintiff's range of motion was good and x-rays revealed his joint spaces looked "perfect" with "nice subchondral bone bilaterally, medial and lateral [in] both legs" and no evidence of spurring. (Tr. 442). Moreover, contrary to Plaintiff's testimony that he drags his left leg behind him when he walks, multiple physicians noted Plaintiff's gait was normal. (Tr. 31, 429, 461, 658).

The ALJ reviewed a significant amount of evidence, including medical records from Plaintiff's prior DIB claim. In addition, the ALJ continued Plaintiff's first hearing to further develop and review Plaintiff's medical records. (Tr. 11). Based on substantial evidence in the record, there is a reasonable probability the prior ALJ would have reached the same conclusion regarding Plaintiff's RFC in light of Plaintiff's bilateral carpel tunnel and bilateral knee osteoarthritis. *Sizemore*, 865 F.2d at 711. Therefore, Plaintiff's argument the ALJ erred in determining Plaintiff's RFC regarding his carpel tunnel and knee osteoarthritis fails.

**Treating Physicians**

Plaintiff argues the ALJ erred by rejecting Dr. Derr–Lewis's opinion – specifically, her opinion that Plaintiff would not be able to function in any kind of remunerative employment. (Doc. 15, at 5). Plaintiff additionally argues the ALJ failed to acknowledge Dr. Black's assessment that Plaintiff was not capable of employment due to neck pain and RSD of the left wrist. (Doc. 9, at 11). Plaintiff's arguments fail because the ALJ considered contradictory opinions offered by Dr. Derr–Lewis and Dr. Black and Dr. Black is not a treating medical source. Moreover, the opinions Plaintiff references are inconsistent with substantial evidence in the record. The ALJ properly weighed the opinions of the treating physicians and did not err in his determination.

An ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.927(d). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and extent; (3) supportability; (4) consistency; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Generally, the medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if supported by "medically acceptable clinical

27

and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

Even if the treating physician's opinion is not entitled to "controlling weight," there is nevertheless a rebuttable presumption that it deserves "great deference" from the ALJ. *Id.* Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion. *Id.* Failure to do so requires remand.  *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409–10 (6th Cir. 2009).

Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502. A medical provider is not considered a treating source if the claimant's relationship with them is based solely on the need to obtain a report in support of their claim for disability. 20 C.F.R. § 404.1502.

First, Plaintiff argues the ALJ provided no reasons for rejecting Dr. Derr–Lewis's opinion. (Doc. 9, at 11). Contrary to Plaintiff's assertion, the ALJ specifically rejected Dr. Derr–Lewis's opinion as inconsistent with the greater weight of the evidence. (Tr. 19-20). Moreover, the evidence considered to reject Dr. Derr–Lewis's opinion were her own reports and those of Plaintiff's treating psychiatrist Dr. Valko. (Tr. 19-20.). The ALJ specifically relied on Dr. Derr–Lewis' s questionnaire and mental RFC report to the BWC. (Tr. 19, 251–57). Dr. Derr–Lewis reported Plaintiff was well-groomed, had fair insight, was focused on medical solutions to his problems, was able to maintain attention, and his conversation and speech were good. (Tr. 253–54). In addition, the ALJ relied on Dr. Valko's reports which consistently and continually

28

noted Plaintiff's depression was controlled with medication. (Tr. 20). Moreover, Dr. Valko's notes report Plaintiff generated conversations, responded to questions appropriately, and displayed intact thought content. (Tr. 229–31, 561–63). Thus, the ALJ provided good reasons for rejecting Dr. Derr–Lewis's opinion.

Second, Plaintiff argues the ALJ failed to give substantial deference to Dr. Black's opinion – specifically, his opinion that Plaintiff was unable to work due to neck pain and RSD in his left wrist. (Doc. 9, at 11). However, contrary to Plaintiff's assertion, the ALJ was not required to give Dr. Black substantial deference. A treating source under 20 C.F.R. § 404.1527(d)(2) must be a *medical* source and a chiropractor is not a medical source. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997) (emphasis added); *see also* 20 C.F.R. § 404.1513. Accordingly, the ALJ has the discretion to determine the appropriate weight to accord a chiropractor's opinion based on all evidence in the record since a chiropractor is not a medical source. *Walters*, 127 F.3d at 530.

As Defendant points out, virtually every acceptable medical source rendered an opinion consistent with the ALJ's sedentary finding. This includes two state agency physicians and four independent examining physicians. (Tr. 19, 298–305, 324, 638, 648, 650, 660, 666). Moreover, Plaintiff fails to acknowledge Dr. Black's assessment that Plaintiff was able to engage in occasional fine and gross motor handling and Dr. Nielson's "very exciting news" that Plaintiff regained total resolution of his left hand during an appointment. (Tr. 346, 599).

Substantial evidence in the record supports the weight the ALJ gave to the opinions of Plaintiff's treating physicians, thus the ALJ did not err.

**Credibility Determination**

Plaintiff argues the ALJ erred in finding his allegations not fully credible. (Doc. 9, at 12–13). A claimant's subjective complaints can support a claim for disability, but there must also be objective medical evidence in the record of an underlying medical condition. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003). Further, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Id.* at 476 (citations omitted). On review, the Court is to "accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying." *Id.* (citation omitted). Still, an ALJ's decision to discount a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Social Security Ruling (SSR) 96–7p, 1996 WL 374186, *2.  In evaluating credibility an ALJ considers certain factors:

> (I) [A claimant's] daily activities;
>
> (ii) The location, duration, frequency, and intensity of [a claimant's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication [a claimant] takes] or ha[s] taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, [a claimant] receive[s] or ha[s] received for relief of [claimant's] pain or other symptoms;
>
> (vi) Any measures [a claimant] use or ha[s] used to relieve [a claimant's] pain or

30

other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning [a claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3); 416.929(c)(3).

The ALJ's credibility assessment considered the objective medical evidence and the opinions of Plaintiff's treating physicians, the state agency physicians, and independent medical physicians.  The ALJ noted that while Plaintiff's impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects were not credible. (Tr. 18). Significantly, the ALJ noted no physician imposed greater restrictions on the Plaintiff than those assessed in his decision. (Tr. 19). The ALJ noted that his RFC, and therefore the credibility determination, was consistent with multiple physicians' assessments that Plaintiff could perform sedentary work. (Tr. 19, 638, 648, 658, 666). Finally, the ALJ noted Plaintiff reported some, but not all, pain relief from the spinal stimulator. (Tr. 18).

The ALJ noted Dr. Derr–Lewis's mental RFC of the Plaintiff was severely more restrictive than the finding he reached. (Tr. 19). However, the ALJ rejected her opinion based on the greater weight of the evidence. (Tr. 19). Specifically, the ALJ cited the opinions of Dr. Valko, who reported Plaintiff's depression was under control with medication, and Dr. Derr-Lewis's own reports that Plaintiff was capable of understanding, maintaining attention and remembering and carrying out simple instructions. (Tr. 19).

Last, the Plaintiff's was less than forthcoming about his social activities.  Plaintiff stated in state agency reports he had no social life other than doctors appointments and occasional school activities for his kids. (Tr. 156, 173–74, 327). However the record clearly reveals Plaintiff

31

purchased two properties, which he was rehabilitating, and he was involved in local politics as a political appointee. (Tr. 43, 52–53).

The ALJ's credibility determination was reasonable and supported by substantial evidence.

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds the ALJ's decision denying DIB benefits supported by substantial evidence. Therefore, the Court affirms the Commissioner's decision denying benefits.

S/James R. Knepp II
United States Magistrate Judge